1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    STEPHANIE N. TORRES,                        No.  2:21-cv-00743 KJM GGH P

12                   Petitioner,

13         v.                                     ORDER AND FINDINGS AND
                                                  RECOMMENDATIONS
14    MONA D. HOUSTON, Warden,

15                   Respondent.

16

17

18    *Introduction and Summary*

19          Petitioner, a state prisoner proceeding pro se, has filed a petition for writ of habeas corpus

20    pursuant to 28 U.S.C. §2254. The matter was referred to the United States Magistrate Judge

21    pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 302(c).

22          Poor aim or not, if one shoots a bullet at another person, such a shooting can be termed

23    "attempted murder." It was in this case. Petitioner contends that the evidence was insufficient to

24    show that she actually intended to kill anyone. However, petitioner's argument about insufficient

25    evidence essentially constitutes the oft argued, fallacious assertion that if the evidence could be

26    construed in petitioner's favor, the evidence for conviction is *ipso facto* insufficient. That

27    argument fails here as well. Also, petitioner's argument about the erroneous "kill zone" theory

28    will fail for the reason that, in actuality, no such theory was given to the jury for decision, and in

                                                1

1   any event, no federal interest was implicated by the giving of the instruction here. After carefully

2   reviewing the filings, and application of the applicable law, this court recommends petitioner's

3   habeas petition be denied.

4   *Factual Background*

5          The court has conducted a thorough review of the record in this case, as well as the

6   California Court of Appeal, Third Appellate District's (Court of Appeal) unpublished

7   memorandum and opinion. The appellate court's summary of the facts is consistent with the

8   court's own review of the record.  Accordingly, it is provided below:

> The background is limited to the circumstances pertinent to the contentions on appeal. Defendant shot and injured a man who allegedly made unwanted advances toward her teenage sister. The next day, Deputy Jarrod Valdes attempted to stop a car described in a domestic disturbance report. The car did not pull over in response to his patrol lights and siren but instead attempted to flee. The fleeing car was eventually pursued by Deputy Valdes, Deputy William Derbonne and Deputy Greg Thompson in separate vehicles. At one point, Deputy Valdes heard what he thought were gunshots, but he could not see where they were coming from because he was driving behind Deputy Derbonne at the time. The shots were fired during the initial part of the pursuit over the course of about a minute, coming in regular succession in one or two shot intervals. He said any one of the pursuing officers could have been hit by a bullet.

> The pursuit ended when the fleeing car parked at an apartment complex. Defendant exited the car from the back seat. An inspection of the car revealed damage to a rear window consistent with a shot being fired through it.

> Deputy Derbonne testified that during the pursuit he could see a firearm and the muzzle flashes of shots being fired. The shooter had tattoos consistent with defendant's. Deputy Derbonne ducked and swerved to get out of the line of fire. He then noticed he was being shot at from the other side of the fleeing car. He could see the firearm because he was about 20 feet from the fleeing car with all of his lights on, and he could tell the handgun was pointed in his direction. He could tell the shots were not being fired into the air or toward the ground, he could see the shots were fired in his direction. Deputy Derbonne testified that when a handgun is aimed at you and when somebody is shooting at you, you can tell, because the flash is coming towards your direction. He said the muzzle flash was not going up in the air and the barrel of the gun was not pointed in the air. Deputy Derbonne believed there were at least six shots, possibly more. To his knowledge, no shots hit the patrol cars or any of the surrounding parked cars or buildings. During the pursuit, Derbonne maintained his position directly behind the fleeing car.

28   ////

Alfredo Galvan is defendant's cousin and testified that he drove the fleeing car. He was giving defendant and Marlen Fernandez a ride when the patrol car lights illuminated. When defendant told Galvan she would shoot the officers if Galvan stopped the car, Galvan was scared and continued to drive. He said shots originated from the right rear of the car, and defendant was the only person in the backseat as the shots continued. Eventually, defendant said she would surrender if Galvan drove to her mother's home, which he did. Galvan admitted on cross-examination that he had originally been charged with attempted murder, but the charges were dismissed after he agreed to testify against defendant.

Officer Justin Jimenez testified that he recovered a loaded handgun in the pursuit area. Detective Eric Patterson interviewed defendant, who admitted throwing a gun from the fleeing car. Defendant said she was in the front seat with Fernandez and Galvan when the patrol lights were activated, but she crawled into the backseat. She denied firing at the police.

Deputy Valdes testified that both defendant and Fernandez have tattoos on their hands, but defendant also has tattoos on her arms. Detective Patterson testified that they did not observe bullet holes in the pursuing cars or in any of the buildings or vehicles in the pursuit area. However, Patterson said that was not unusual under the circumstances; searching for holes was like "looking for a needle in a haystack." Authorities recovered several shell casings along the road.

In connection with the shooting of the man who allegedly made unwanted advances toward defendant's teenage sister, the jury convicted defendant of assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b) -- count II),[(Fn. 1 omitted)] possession of a firearm by a felon (§ 29800, subd. (a) -- count III), and possession of ammunition by a felon (§ 30305, subd. (a) -- count IV). The jury also found true allegations that defendant, in the commission of the count II assault, personally inflicted great bodily injury (§ 12022.7, subd. (a)) and personally used a firearm (§ 12022.5).

Moreover, in connection with the shots fired at the pursuing police officers the next day, the jury convicted defendant on three counts of first degree attempted murder (§§ 664/187, subd. (a) -- counts V-VII), possession of a firearm by a felon (§ 29800, subd. (a) -- count XI), and possession of ammunition by a felon (§ 30305, subd. (a) -- count XII). The jury also found true allegations that defendant, in the commission of counts V-VII, personally and intentionally discharged a firearm (§ 12022.53, subd. (c)).

Defendant admitted, as to all counts, that she had a prior serious felony conviction (§ 667, subd. (a)(1)), three prior prison terms (§ 667.5, subd. (b)), and a prior strike conviction (§ 1170.12, subds. (a)-(d)).

////

////

3

1     The trial court sentenced defendant to an aggregate 77 years four
2     months in prison.

3  People v. Torres, No. C087086, 2020 WL 255068, at *1-2 (Cal. Ct. App. Jan. 17, 2020).

4     The undersigned adds that petitioner did not testify. Nor did the defense offer any

5  evidence as to petitioner's state of mind. Her stated protestation here *in this federal habeas*

6  *proceeding* is that her firing wildly without intent to kill is not evidence.

7  *Procedural Background*

8     This habeas petition was filed on April 26, 2021. ECF No. 1. An answer was filed on July

9  7, 2012, and a traverse was filed on September 7, 2021. ECF Nos. 13, 17. The issues raised by the

10  petition are referenced in this Findings and Recommendations' *Introduction and Summary*.

11  *Legal Standard of Review*

12     The statutory limitations of a federal courts' power to issue habeas corpus relief for

13  persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and

14  Effective Death Penalty Act of 1996 ("AEDPA").  The text of § 2254 provides:

15          (d) An application for a writ of habeas corpus on behalf of a person
           in custody pursuant to the judgment of a state court shall not be
16          granted with respect to any claim that was adjudicated on the merits
           in State court proceedings unless the adjudication of the claim—
17
18              (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
            determined by the Supreme Court of the United States; or
19
20              (2) resulted in a decision that was based on an unreasonable
            determination of facts in light of the evidence presented in the State
            court proceeding.
21

22     As a preliminary matter, the Supreme Court has held and reconfirmed "that § 2254(d)

23  does not requires a state court to give reasons before its decision can be deemed to have been

24  'adjudicated on the merits.'" Harrington v. Richter, 562 U.S. 86, 98 (2011).  Rather, "when a

25  federal claim has been presented to a state court and the state court has denied relief, it may be

26  presumed that the state court adjudicated the claim on the merits in the absence of any indication

27  or state-law procedural principles to the contrary." Id. at 99 (citing Harris v. Reed, 489 U.S. 255,

28  265 (1989) (presumption of a merits determination when it is unclear whether a decision

4

appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Harrington, supra, at 101 (citing Williams v. Taylor, 529 U.S. 362, 410 (2000)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 101 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Accordingly, "a habeas court must determine what arguments or theories supported or…could have supported [] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 102. "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Id. Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003).)

The undersigned also finds that the same deference is paid to the factual determinations of state courts. Under § 2254(d)(2), factual findings of the state courts are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." It makes no sense to interpret "unreasonable" in §2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not

////

1   abide by the state court's factual determination. A petitioner must show clearly and convincingly

2   that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338 (2006).

3         The habeas corpus petitioner bears the burden of demonstrating the objectively

4   unreasonable nature of the state court decision in light of controlling Supreme Court authority.

5   Woodford v. Viscotti, 537 U.S. 19 (2002). Specifically, the petitioner "must show that the state

6   court's ruling on the claim being presented in federal court was so lacking in justification that

7   there was an error well understood and comprehended in existing law beyond any possibility for

8   fairminded disagreement." Harrington, supra, at 102. "Clearly established" law is law that has

9   been "squarely addressed" by the United States Supreme Court. Wright v. Van Patten, 552 U.S.

10  120, 125 (2008). Thus, extrapolations of settled law to unique situations will not qualify as

11  clearly established. See, e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not

12  permitting state sponsored practices to inject bias into a criminal proceeding by compelling a

13  defendant to wear prison clothing or by unnecessary showing of uniformed guards does not

14  qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

15  The established Supreme Court authority reviewed must be a pronouncement on constitutional

16  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

17  binding only on federal courts. Early v. Packer, 537 U.S. 3, 9 (2002).

18        The state courts need not have cited to federal authority, or even have indicated awareness

19  of federal authority in arriving at their decision. Id. at 8. Where the state courts have not

20  addressed the constitutional issue in dispute in any reasoned opinion, the federal court will

21  independently review the record regarding that issue. Independent review of the record is not *de*

22  *novo* review of the constitutional issue, but rather, the only method by which we can determine

23  whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d

24  848, 853 (9th Cir. 2003).

25        Finally, if the state courts have not adjudicated the merits of the federal issue, no AEDPA

26  deference is given; instead the issue is reviewed *de novo* under general principles of federal law.

27  Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012). However, when a state court decision on a

28  petitioner's claims rejects some claims but does not expressly address a federal claim, a federal

habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. <u>Johnson v. Williams</u>, 568 U.S. 289, 293 (2013).

*Discussion*

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, (1979). <u>Jackson</u> established a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. <u>United States v. Nevils</u>, 598 F.3d 1158, 1164-65 (9th Cir. 2010) (en banc):

> First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781...[W]hen "faced with a record of historical facts that supports conflicting inferences" a reviewing court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326, 99 S.Ct. 2781; *see also McDaniel,* 130 S.Ct. at 673–74.

> Second, after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow "*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781.

> ***

> At this second step, we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt. *See id.*

And, where the trier of fact could draw conflicting inferences from the facts presented, one favoring guilt and the other not, the reviewing court will assign the one which favors conviction. <u>McMillan v. Gomez</u>, 19 F.3d 465, 469 (9th Cir. 1994). However, the mere fact that an inference can be assigned in favor of the government's case does not mean that the evidence on a disputed crime element is sufficient—the inference, along with other evidence, must demonstrate that a reasonable jury could find the element beyond a reasonable doubt, i.e., "'[A] reasonable

1    inference is one that is supported by a chain of logic, rather than mere speculation dressed up in

2    the guise of evidence.'" United States v. Katakis, 800 F.3d 1017, 1024 (9th Cir. 2015).  Finally,

3    the relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but

4    whether the factfinder could rationally arrive at its verdict. United States v. Fleishman, 684 F.2d

5    1329, 1340 (9th Cir. 1982).

6    　　　Superimposed on these already stringent insufficiency standards is the AEDPA

7    requirement that even if a federal court were to initially find on its own that no reasonable jury

8    should have arrived at its conclusion, the federal court must actually determine that the state

9    appellate court could not have affirmed the verdict under the Jackson standard in the absence of

10   an unreasonable determination. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005), i.e.,

11   reasonable jurists, upon review, could not uphold the state courts' determination that the evidence

12   was sufficient.

13   　　　A federal habeas court determines sufficiency of the evidence in reference to the

14   substantive elements of the criminal offense as defined by state law. See Jackson, 443 U.S. at 324

15   n. 16; Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004) (en banc).

16   　　　1.  Insufficiency of the Evidence With Respect to Attempted Murder

17   　　　In California, to prove the crime of attempted murder, the prosecution must establish "the

18   specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the

19   intended killing." People v. Lee, 31 Cal.4th 613, 623 (2003). When a single act is charged as an

20   attempt on the lives of two or more persons, the intent to kill element must be examined

21   independently as to each alleged attempted murder victim; an intent to kill cannot be

22   "transferred" from one attempted murder victim to another under the transferred intent doctrine.

23   People v. Bland, 28 Cal.4th 313, 327–328 (2002).

24   　　　　　　　We also explained, however, that if a person targets one particular
     person, under some facts a jury could find the person *also*,
25   concurrently, intended to kill—and thus was guilty of the attempted
     murder of—other, nontargeted, persons. Citing a Maryland case
26   (*Ford v. State* (1993) 330 Md. 682, 625 A.2d 984), we explained that
     "the fact the person desires to kill a particular target does not preclude
27   finding that the person also, concurrently, intended to kill others
     within what [the Ford court] termed the 'kill zone.' " (*Bland, supra*,
28   28 Cal.4th at p. 329, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) For

8

example, if a person placed a bomb on a commercial airplane intending to kill a primary target, but also ensuring the death of all the passengers, the person could be convicted of the attempted murder of all the passengers, and not only the primary target. (*Bland, supra*, at pp. 329–330, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) Likewise, in *Bland,* "[e]ven if the jury found that defendant primarily wanted to kill [a driver] rather than [the] passengers, it could reasonably also have found a concurrent intent to kill those passengers when defendant and his cohort fired a flurry of bullets at the fleeing car and thereby created a kill zone. Such a finding fully supports attempted murder convictions as to the passengers." (*Id.* at pp. 330–331, 121 Cal.Rptr.2d 546, 48 P.3d 1107.)

We also explained in *Bland* that this "concurrent intent" or "kill zone" theory "is not a legal doctrine requiring special jury instructions.... Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*Bland, supra,* 28 Cal.4th at p. 331, fn. 6, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) Nevertheless, current pattern jury instructions discuss the kill zone theory. (CALJIC No. 8.66.1 (2004 rev.);1 CALCRIM No. 600 (2008).)2 [omitted] The Bench Notes to CALCRIM No. 600 explain that *Bland* stated that a special instruction on the point is not required, and that the kill zone "language is provided for the court to use at its discretion."

People v. Stone, 46 Cal. 4th 131, 137-138 (2009).

Because, as found by the Court of Appeal, the kill zone theory was not actually presented to the jury, see below, the undersigned reviews the issue here under the standard that attempted murder had to be shown with respect to all three deputies.  First, the undersigned sets forth the reasoning of the Court of Appeal:

Defendant expressed her intent to shoot the deputies if her cousin stopped the car. Her cousin kept driving out of fear, but the evidence shows defendant nevertheless opened fire in the direction of the pursuing deputies. Deputy Derbonne ducked and swerved to get out of the line of fire. He then noticed he was being shot at from the other side of the fleeing car. He could see the firearm because he was about 20 feet from the fleeing car with all of his lights on, and he could tell the handgun was pointed in his direction. He could tell the shots were not being fired into the air or toward the ground. Deputy Valdes was driving behind Deputy Derbonne and testified any one of the pursuing deputies could have been hit by a bullet.

That the deputies were unable to find any bullet holes in their cars does not preclude a finding that defendant intended to kill the deputies. She could certainly argue that circumstance to the jury, but the testimony of the deputies was clear that defendant was shooting in their direction. On the facts of this case, the jury was free to find that defendant failed to hit the deputies' cars because of the movement of the car defendant was riding in, her poor aim, and the

9

1    deputies' effort to avoid her aim. Thus, the jury was not required to
     find defendant did not intend to kill the deputies even if she failed to
2    hit their cars.

3    Likewise, the contingent nature of defendant's threat to Galvan that
     she would shoot a deputy if Galvan stopped the car was another
4    circumstance defendant could argue to the jury, but it does not
     overcome the substantial nature of the evidence that she expressed a
5    willingness to shoot a deputy and actually shot at the deputies as they
     were pursuing the car. A jury could reasonably infer the intent to kill
6    from the evidence in this case.

7    People v. Torres, supra, 2020 WL 255068, at *3.

8          There is no doubt that the evidence was sufficient as to Deputy Derbonne, who as to all

9    times at which the shots were fired, was in the lead car closest to petitioner's car. ECF No. 11-3 at

10   178-180. He testified as to the direction of fire, which was levelled, at the very least, at his car.

11   Any jury (and reviewing court) could rationally come to the conclusion that Derbonne was an

12   intended target. And, petitioner's driver had related petitioner's state of mind when ordered not to

13   stop or she would kill the cop(s).  We should not forget that petitioner shot her civilian target a

14   day before the police chase. The jury would have understood that murder was not a foreign

15   concept to petitioner. The weapon used by petitioner, a .22 caliber presumably semi-automatic,

16   (ECF No. 11-3 at 217), was close to fully expended during the chase.[1]  That petitioner could

17   argue that the facts were consistent with merely attempting to dissuade the chase by "wildly"

18   shooting in the general direction of the police car(s), and not premeditated attempted murder,

19   does not mean that the finding of premeditated attempted murder was insufficient.

20         The above conclusion is less clear for Deputies Valdes and Thompson. These deputies

21   were, respectively, in cars two and three behind Derbonne. After testifying that Derbonne was the

22   person most in danger from being hit by gunfire, ECF No. 11-3 at 169, testimony which was

23   inexplicably objected to by defense counsel, and then sustained by the judge, Valdes testified that

24   all three deputies could "easily" have been hit by the gunfire. Id. at 170. The evidence does show

25

26   _____

         [1] The testimony referenced a "magazine," something that is connected to a semi-automatic
27   firearm. ECF No 11-3 at 217. Moreover, the deputies testified to numerous shots being fired in
     fairly short order—too numerous for a revolver.  Finally, unfired bullets were found in
28   petitioner's pocket and car, and it was possible that the magazine had been reloaded during the
     chase. ECF No. 11-3 at 238.

10

1  that the lead patrol car was swerving in and out to avoid being hit, id. at 170; 179, thereby

2  possibly exposing the other deputies.  There is no evidence that petitioner would have "called it a

3  day" simply because she had shot the lead deputy. Thus, the fact that all three deputies

4  (incontrovertibly) could have been easily hit is the only evidence demonstrating petitioner's state

5  of mind with respect to the second and third place deputies, as the defense presented no evidence

6  otherwise. It is here that the jury could draw a logical inference that petitioner was shooting at all

7  three deputies.[2]  Nevertheless, the evidence is slim regarding deputies two and three.[3]

8  ////

9  ////

10  ////

11  ////

12  ////

13  ////

14  ////

15  ////

16  ////

17  ////

18  ////

19  _____

20      [2] Nevertheless, the testimony of the driver who recounted petitioner's statement was
vague as to whether a single "cop" was the subject of petitioner's intent or whether cops (plural)

21  was intended by petitioner's statement.
            Q. […] What, if anything, did your cousin, Stephanie Torres, say?

22          A.  That if I stopped the car, she'd shoot 'em.
            Q. By shoot them?

23          A. The cop.
ECF No. 11-3 at 203.

24          Q. And you claim that my client told you that if you stopped the car
            she would shoot the cops?

25          A. Shoot him, yes.
            Q. Shoot him?

26          A. The cop, yeah.
ECF No. 11-3 at 208.

27      It could be argued that petitioner was aware of just one car chasing her by
virtue of this testimony.

28      [3] Deputy Thompson, for whatever reason, did not testify.

11

1    Given all the facts and circumstances recounted above, however, the undersigned cannot

2    find the Court of Appeal's finding of intent sufficiency AEDPA unreasonable.[4] [5]

3    ////

4    ////

5    [4] Petitioner does not argue that the jury's finding of *premediated* attempted murder was

6    inaccurate as to the premedition component necessary for an enhanced punishment; she argues

7    only that specific intent to kill altogether was missing. California law on the "degrees" of attempted murder is complicated, and even the Court of Appeal in this case incorrectly found that the jury had convicted petitioner of first-degree attempted murder (emphasis added):

8

9    > Hart's analysis fails for two reasons. First, contrary to Hart's
> presupposition, attempted premeditated murder and attempted
10   > unpremeditated murder are not separate offenses. *Attempted murder
> is not divided into different degrees.* (*People v. Douglas* (1990) 220
11   > Cal.App.3d 544, 549, 269 Cal.Rptr. 579 [rejecting claim that
> attempted second degree murder is lesser offense included within
12   > offense of attempted willful, deliberate, and premeditated murder],
> cited with approval in *People v. Bright* (1996) 12 Cal.4th 652, 665–
13   > 667, 49 Cal.Rptr.2d 732, 909 P.2d 1354 (*Bright*), which we
> disapproved on another ground in *People v. Seel* (2004) 34 Cal.4th
14   > 535, 550, fn. 6, (21 Cal.Rptr.3d 179, 100 P.3d 870.2 ) "[T]he
> provision in section 664, subdivision (a), imposing a greater
15   > punishment for an attempt to commit a murder that is 'willful,
> deliberate, and premeditated' does not create a greater degree of
16   > attempted murder but, rather, constitutes a penalty provision that
> prescribes an increase in punishment (a greater base term) for the
17   > offense of attempted murder." (*Bright, supra,* 12 Cal.4th at pp. 656–
> 657, 49 Cal.Rptr.2d 732, 909 P.2d 1354.) "[T]he statutory language
18   > employed in prescribing an additional penalty for attempted murder
> ... reflects a legislative intent to create a penalty provision specifying
19   > a greater term, rather than a substantive offense." (*Bright, supra,* 12
> Cal.4th at p. 668, 49 Cal.Rptr.2d 732, 909 P.2d 1354; *see also id.* at
20   > p. 670, 49 Cal.Rptr.2d 732, 909 P.2d 1354 ["the division of a crime
> into degrees constitutes an exclusively legislative function"].) Thus,
21   > " premeditated attempted murder is not a separate offense from
> attempted murder." (*Anthony v. Superior Court* (2010) 188
22   > Cal.App.4th 700, 706, 115 Cal.Rptr.3d 519.) Because [*People v.*]
> *Woods*[, (1992) 8 Cal.App.4th 1570] involved murder—not
23   > attempted murder—where there are different degrees of the offense,
> Hart 's reliance on *Woods*'s lesser included offense analysis is
24   > misplaced.

25   People v. Favor, 54 Cal. 4th 868, 876-877 (2012).
     In this case, once the jury found a specific intent to kill, the fact that it was

26   premeditated followed as night does day, i.e., she had communicated her intent to kill the
     deputy(s) to her driver which bespeaks premeditation, however short.

27   [5] It is somewhat ironic that the incident involving the person who petitioner actually did
     shoot the day before the missed shots were taken at the deputies, only warranted an assault with a

28   deadly weapon conviction.

12

2. The Kill Zone Instruction for Attempted Murder

Petitioner does not contend that a kill zone instruction violates some aspect of due process *per se,* but does argue that the evidence was insufficient to support giving the instruction.

The law pertinent to the kill zone theory has been set forth above. The Court of Appeal's bottom line was that the jury, in actuality, was not asked to determine the case based on the kill zone theory.

> The trial court then instructed the jury with a bracketed portion of CALCRIM No. 600 designed to instruct on the kill zone theory. But the trial court filled in the blanks for that portion of the instruction in such a way that the jury was only allowed to convict defendant for attempted murder of each deputy if defendant intended to kill that deputy, without regard to whether defendant created a zone of fatal harm. Specifically, the relevant bracketed portion of CALCRIM No. 600 provides: "In order to convict the defendant of the attempted murder of [insert name of victim based on concurrent-intent theory], the People must prove that the defendant not only intended to kill [insert name of alleged primary target] but also either intended to kill [insert name of victim based on concurrent-intent theory], or intended to kill everyone within the kill zone." To instruct on attempted murder based on a kill zone theory as to alleged victim Deputy Derbonne, the trial court should have inserted Deputy Derbonne's name in the first and third blanks as the alleged concurrent-intent victim and inserted someone else's name in the second blank referring to the alleged primary target. But instead, the trial court inserted Deputy Derbonne's name into all three blanks, as follows: "In order to convict the defendant of the attempted murder of Deputy William Derbonne, the People must show that the defendant not only intended to kill Deputy William Derbonne but also intended to kill Deputy William Derbonne or intended to kill everyone within the kill zone." The trial court gave that same bracketed portion of the instruction in connection with the other two alleged deputy victims, inserting each deputy's name into all three blanks, just like the trial court had done with Deputy Derbonne's name.

> The purpose of CALCRIM No. 600 is to present to the jury two options for finding intent to kill: (1) under the general theory of attempted murder (if the jury finds the defendant intended to kill the named victim), or (2) under the kill zone theory (if the jury finds the defendant intended to kill the named victim because the defendant intended to kill the primary target other than the named victim, the defendant concurrently intended to kill everyone within the zone of fatal harm, and the named victim was within the zone of fatal harm). Based on the way the trial court gave the instructions in this case, however, the jury could only convict on each count of attempted murder if it found that the named victim was the primary target, which is essentially the general theory of attempted murder.

////

13

1

Therefore, the instruction effectively precluded the jury from relying
on the kill zone theory to convict defendant of attempted murder.

2

3    People v. Torres, 2020 WL 255068, at *4.

4          The undersigned cannot find this conclusion AEDPA unreasonable.

5          Respondent also correctly observes, citing Griffin v. United States, 502 U.S. 46, 59-60

6    (1991), and United States v. Gonzalez, 906 F.3d 784, 790-91 (9th Cir. 2018), that even if the kill

7    zone theory was actually presented to the jury, and there was insufficient evidence to support it,

8    the jury will be presumed to have chosen the theory for which sufficient evidence exists.

9    Petitioner's second argument cannot withstand AEDPA scrutiny.

10   *Certificate of Appealability*

11         Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must

12   issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A

13   certificate of appealability may issue only "if the applicant has made a substantial showing of the

14   denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate of appealability must

15   "indicate which specific issue or issues satisfy" the requirement.  28 U.S.C. § 2253(c)(3).

16         A certificate of appealability should be granted for any issue that petitioner can

17   demonstrate is "'debatable among jurists of reason,'" could be resolved differently by a different

18   court, or is "'adequate to deserve encouragement to proceed further.'" Jennings v. Woodford, 290

19   F.3d 1006, 1010 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

20         Petitioner has made a substantial showing of the denial of a constitutional right in the

21   following issue presented in the instant petition: insufficiency of the evidence regarding the intent

22   to kill deputies Valdes and Thompson (cars two and three).

23   *Conclusion*

24         IT IS HEREBY ORDERED that:

25         1. The Federal Defender is appointed for the limited purposes of arguing objections, if

26   any, for petitioner[6]; and

27

28         [6] See 18 U.S.C. § 3006A(a)(2)(B); see also Weygandt v. Look, 718 F.2d 952, 954 (9th
Cir. 1983). Of course, the Federal Defender may seek appointment for an attorney on the CJA

2. The Clerk of the Court is directed to serve a copy of this order and findings and recommendations on the Federal Defender, Attention: Habeas Appointment.

Further, IT IS HEREBY RECOMMENDED that:

1. The habeas petition be DENIED; and

2. A Certificate of Appealability should issue as to the insufficiency of the evidence issue regarding the intent to kill deputies Valdes and Thompson (cars two and three).

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: September 27, 2021

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE

panel in lieu of attorney representation from the Office of the Federal Defender.

15